Norma E. GODFREY and Keith Godfrey, Appellants and Cross–Appellees,

v.

Shirley L. HEMENWAY and Robert B. Hemenway, Appellees and Cross–Appellants.

Nos. 4382, 4448.

Supreme Court of Alaska.

Sept. 26, 1980.

**6.** *See also McConnell v. State*, 595 P.2d 147, 150 52 (Alaska 1979).

Richard D. Pennington, Aglietti, Offret & Pennington, and Elizabeth I. Johnson, Boyko & Davis, Anchorage, for appellants and cross–appellees.

Phillip J. Eide, Ely, Guess & Rudd, Anchorage, for appellees and cross–appellants.

Before RABINOWITZ, C. J., and CONNOR, BOOCHEVER,* BURKE and MATTHEWS, JJ.

## OPINION

BURKE, Justice.

On April 18, 1976, at mile 83 of the Glenn Highway, a car driven by Mrs. Shirley Hemenway crossed the centerline and collided head–on with a car driven by Dr. Norma Godfrey. Dr. Godfrey suffered extensive injuries in the accident. In March of 1977, Dr. Godfrey and her husband, Keith, brought this action for damages against Mrs. Hemenway and her husband, Robert.

The Godfreys asserted that the Hemenways were negligent in maintaining and

* This case was submitted to the court for decision prior to Justice Boochever's resignation.

operating their vehicle. The Hemenways responded that their vehicle's crossing of the centerline was the result of a collision with a moose, and not due to any negligence on their part. After a lengthy trial, the jury returned a verdict in favor of the Hemenways. Following the superior court's denial of their motions for a new trial and judgment notwithstanding the verdict, the Godfreys filed this appeal. As the prevailing parties, the Hemenways sought costs of $31,483.41 and attorney's fees of $95,000. The trial court awarded $12,000 in attorney's fees and affirmed the court clerk's award of $3,587.98 in costs. All costs relating to expert witnesses were denied. The Hemenways have taken a cross-appeal from the rulings.

The circumstances surrounding the accident were vigorously disputed at trial. In addition to the testimony of both drivers and the state troopers who investigated the accident, each side offered the testimony of expert witnesses who presented conflicting explanations of the possible sequence of events leading up to the collision.

On the day in question, Dr. Godfrey was traveling northbound from Anchorage to Glennallen, while Mrs. Hemenway and her five children were traveling southbound from Glennallen to Wasilla. The two cars collided head–on in the northbound lane after Mrs. Hemenway's vehicle swerved across the centerline. Mrs. Hemenway testified that her sudden crossing of the centerline was the result of a collision with a moose that had run onto the highway into her path. She first saw the moose run onto the highway from the right shoulder as she came out of a curve on a slight grade. She immediately applied her brakes but was unable to stop before hitting the moose. The impact caused her to swerve across the centerline into the northbound lane where she saw the headlights of the oncoming car for the first time. Despite her continued braking the cars collided.

As a result of the short time span in which the accident occurred, Mrs. Hemenway was unable to give a definite account of all of the details surrounding the two collisions. For example, she was certain that she hit the moose but she could not say with what part of her car. Nor could she recall attempting to avoid the moose or attempting to get back into her own lane, although the latter thought did enter her mind. Although she was unsure of her exact speed prior to braking, she was "pretty sure" she was not exceeding the speed limit. Her normal speed is about forty miles per hour, but on cross–examination she admitted that she could have been going as fast as fifty or fifty–five. Finally, she has no idea what happened to the moose after she hit it.

Dr. Godfrey confirmed that a moose had run onto the road between the two vehicles. She did not, however, see anything indicating that the other car hit the moose. Rather, she testified that the moose ran in front of the other car, into her own lane, and off of the road. She began to slow down when she first saw movement on the road. Once she was sure that it was a moose, she began braking as hard as she could. After the moose had entered her lane she noticed that the other car was also crossing the centerline. She continued braking until the cars collided. Although she was unsure of her speed at the point of impact, she felt that she must have slowed down considerably from her initial speed of about fifty miles per hour.

Trooper Nygren, one of the two Alaska State Troopers who investigated the accident, testified that Mrs. Hemenway's car left a straight skid mark for approximately 100 feet. The skid mark then curved to the left into the other lane and continued for another fifty–two feet to the point of impact. The Godfrey car was in a straight skid for approximately seventy feet prior to the point of impact.

Mr. Williard Pennington, a witness for the Godfreys and an expert in brake maintenance, testified that, in his opinion, the brakes on the Hemenway vehicle were worn out and their stopping capability would be very poor.

Mr. William Kieling, another witness for the Godfreys and an expert in accident re-

construction, testified that, in his opinion, Mrs. Hemenway's crossing of the centerline was probably the result of her combined braking and steering, not a collision with a moose. He felt that the brakes were so worn that, after the car had been in a locked two–wheel skid for approximately 100 feet, the left front brake released. Once the brake released, Mrs. Hemenway regained partial steering control which allowed her to steer the car into the other lane. He could not, however, rule out the possibility that the lane change was the result of a collision with a moose. He further testified that, based on his examination of the damaged vehicles, the combined speed of the vehicles at the point of impact was about thirty miles per hour. He was unable to estimate the individual speed of either of the cars either at the time of the collision or immediately prior to braking. He was, however, able to determine the distance in which the Hemenways' car should have stopped at various speeds. Assuming a locked four–wheel skid on a two per cent downgrade, an average coefficient of friction between the tires and the highway, dry pavement and initial speeds of 60, 55, 50, and 40 miles per hour the car should have stopped in approximately 177, 150, 123, and 79 feet, respectively.

Dr. David Yoshida, a witness for the Hemenways and an expert in accident reconstruction, testified that, in his opinion, there were three possible explanations for Mrs. Hemenway's veer to the left. First, she steered the car in that direction. Second, something happened to the brakes which had not happened before causing the vehicle to pull to the left. Third, an outside force acting on the vehicle caused it to veer to the left. In light of the evidence that the car was in a locked–wheel skid, he felt that the first possibility must be rejected; Mrs. Hemenway had no steering control. He also disregarded the second possibility on the grounds that, although the brakes were worn, they were still able to function properly. Indeed, the evidence of a locked

brake skid suggests they were functioning properly. Moreover, once a brake has locked, there is no reason for it to unlock until the braking is stopped. The type of brake fade suggested by Mr. Kieling occurs when the brakes are ridden, not when they are locked. Dr. Yoshida did not, however, find any reason to disregard the third possibility. In his opinion, an impact with an outside force, such as a moose, was the only possible explanation that was consistent with the evidence.

Dr. Yoshida also testified that the skid marks indicated that the Hemenway vehicle had been knocked backwards by the collision. This evidence led him to conclude that at the time of impact the Godfrey vehicle was going faster than the Hemenway vehicle. He felt this was consistent with his conclusion that, assuming an initial speed of fifty–five miles per hour for both vehicles, the Hemenway vehicle would be stopped or nearly stopped at the time of impact while the Godfrey vehicle would be going thirty to forty miles per hour. Finally, Dr. Yoshida testified that at initial speeds of fifty–five and forty miles per hour the Hemenway vehicle should have skidded to a stop in approximately 150 and 78 feet, respectively.

In this appeal the Godfreys allege numerous errors regarding the trial court's instructions to the jury and the denial of their motion for judgment notwithstanding the verdict or, in the alternative, a new trial.

■ We turn first to the alleged error regarding the jury instructions. The Godfreys' initial contention is that the trial court erred by allowing them only forty–five minutes in which to argue their requested jury instructions. This argument is without merit. The court fully complied with Civil Rule 51(a)[1] and there is nothing in the record indicating that forty–five minutes was not a sufficient period in which to make their arguments.

1. Rule 51(a), Alaska R.Civ.P. provides in part: "Opportunity shall be given to make . . . objections out of the hearing of the jury, by excusing the jury or hearing the objections in chambers."

■ The Godfreys next maintain that they were prejudiced by a statement by the trial judge to the jury, which allegedly intimated that a verdict had to be returned either that night or during the next day. It is clear from the record that the trial judge was faced with a dilemma. The trial had taken much longer than had been anticipated and two of the jurors were concerned about catching planes that night. The trial judge discussed this problem with counsel for each side and ultimately decided to inform the jury that they would receive late that afternoon and would be allowed to deliberate until midnight that night and, if necessary, on the next day, which happened to be a Saturday. Specifically, the trial court addressed the jury as follows:

THE COURT: Ladies and gentlemen, I want to thank you for your patience. The secretary is running off the—copying the instructions now. I've been mindful particularly of one juror's problem about getting off to school, but so that you'll know how we intend to run it, counsel will be arguing this case to you in not too many minutes. They're going to have a few minutes to look at the instructions as changed. And I was going to suggest that right after the case is argued, and I instruct you, that we eat dinner. And I was going to further suggest that you deliberate until no longer than midnight tonight. That you terminate your discussions at midnight. Go home and get a good night's sleep, and then come back on Saturday at—which is tomorrow, and start your deliberations at 9:00 o'clock in the morning. Hopefully you'll be able to reach a verdict sometime thereafter, but the bailiff will be here to take care of your needs and take you to lunch if

you're still in deliberations. And I'll have my secretary follow up on the one plane reservation.

We do not believe that this statement was improper. It did not order the jury to return a verdict or establish a fixed time within which a verdict must be reached. Rather, the trial court merely informed the jury that they would be requested to deliberate that evening and, if necessary, into the weekend. In light of the circumstances confronting the trial court, the statement cannot be regarded as an abuse of discretion. *Compare Greenburg v. Giant Food Shopping Center, Inc.*, 158 A.2d 476 (D.C. App.1960) *and Zeitz v. Mara*, 290 Mich. 161, 287 N.W. 418 (1939) *with Pirch v. Firestone Tire and Rubber Co.*, 80 N.M. 323, 455 P.2d 189 (App.1969).

The Godfreys further contend that the trial court erred in refusing to include as part of its instruction on negligence per se a statement of the relevant maximum speed limit as provided by 13 AAC 02.275.[2] In response, the Hemenways argue that the evidence did not support such an instruction.

■ Before a plaintiff is entitled to an instruction on negligence per se, he must demonstrate not only that the statute or regulation in question should be adopted as the applicable standard of care,[3] but also that the record contains sufficient evidence from which a jury could reasonably infer that this statute or regulation was violated. *Bachner v. Rich*, 554 P.2d 430, 441 n.12 (Alaska 1976). As to the quantity of evidence required, the test is whether the facts and resulting inferences are such that reasonable people, viewing the evidence in the

2. The rejected portion of the Godfreys' proposed instruction was drawn from 13 AAC 02.275 and provided:

(b) Except when a special hazard exists that requires lower speed for compliance with (a) of this section . . . a person may not drive a vehicle at a speed in excess of the maximum limit [of] . . .

(3) 55 miles per hour on a paved state highway, other than a city street;

.   .   .   .   .

3. The Hemenways apparently concede that 13 AAC 02.275(b) accurately sets forth the applicable standard of reasonable behavior. Such a concession is consistent with our decision in *Ferrell v. Baxter*, 484 P.2d 250 (Alaska 1971), where we stated that "violation of the vast majority of traffic laws would be tortious departures from the standard of the reasonably prudent driver." *Id.* at 264 n.24. *See also Leigh v. Lundquist*, 540 P.2d 492, 495 (Alaska 1975); *Haisley v. Grant*, 486 P.2d 367, 371 (Alaska 1971).

light most favorable to the party seeking the instruction, could justifiably have different views on the question. If they could, then the question should be submitted to the jury under the appropriate instructions. If they could not, then submitting the issue to the jury would not be justified. *Leigh v. Lundquist,* 540 P.2d 492, 494 (Alaska 1974); *Cummins v. King and Sons,* 453 P.2d 465, 466–67 (Alaska 1969). Where a sufficient evidentiary base does not exist, the trial court is under no duty to instruct the jury on that issue. *Groseth v. Ness,* 421 P.2d 624, 629 (Alaska 1966). The issue thus becomes whether members of the jury, when viewing the evidence in the light most favorable to the Godfreys, could justifiably have had different views on the question of whether or not Mrs. Hemenway had violated the maximum speed limit.

The record contains no direct evidence of Mrs. Hemenway's initial speed other than her testimony that she was "pretty sure" that she was not speeding.[4] However, both accident reconstruction experts agreed that, under the circumstances, if Mrs. Hemenway had been traveling at fifty–five miles per hour prior to braking she would have stopped in approximately 150 feet. The tire marks show that Mrs. Hemenway skidded 152 feet prior to impact. Additionally, Dr. Godfrey testified that she *was very nearly stopped* and Mrs. Hemenway was still moving when the vehicles collided. Viewing this evidence in the light most favorable to the Godfreys, we believe that reasonable jurors could differ on the question of whether Mrs. Hemenway was exceeding the speed limit immediately prior to the accident. We therefore hold that the *trial court erred in failing to instruct the jury on negligence per se.* Moreover, the difference between a negligence per se instruction and an ordinary negligence instruction is such that this error cannot be considered harmless. *See Lopez v. Brown,* 495 P.2d 64, 66 (Alaska 1972).

Having decided that reversal is required on this ground, it is unnecessary for us to reach the Godfreys' remaining contentions.

It is also technically unnecessary for us to reach the issues raised in the cross–appeal. However, our review of the record had disclosed one area in which we feel some guidance might be helpful to the trial court on remand. We have therefore elected to address the question of the effect of a stipulation entered into by the parties during discovery. This stipulation involved depositions of expert witnesses and included a provision stating, "The party taking the expert's deposition shall pay the expert his reasonable fee for time incurred in taking the deposition as provided by Rule 26(6)(4)(C)." The parties are now unable to agree on whether this stipulation was intended to constitute a waiver of future claims of costs.

In general, the construction of stipulations is governed by the rules of contracts. *Kimball v. First National Bank of Fairbanks,* 455 P.2d 894, 898 (Alaska 1969). The primary concern of the courts is to determine the intent of the parties. *Harsh Bldg. Co. v. Bialac,* 22 Ariz.App. 591, 529 P.2d 1185, 1187 (1975); *Parks v. Parks,* 91 N.M. 369, 574 P.2d 588, 591 (1978); 83 C.J.S. *Stipulations* § 11 (1953). The courts look with favor on stipulations designed to simplify, shorten or settle litigation, or to save costs and will not give such stipulations a forced construction. *Greater Anchorage Area Borough v. City of Anchorage,* 504 P.2d 1027, 1031 n.15 (Alaska 1972), *rev'd on other grounds, City & Borough of Juneau v. Thibodeau,* 595 P.2d 626, 629 (Alaska 1979). Thus, the "[l]anguage of a stipulation, whether it be an agreed statement of facts or relates to other matters, will not be so construed as to give it the effect of a waiver of a right not plainly intended to be relinquished." *State By and Through State Highway Commission v. Feves,* 228 Or. 273, 365 P.2d 97, 102 (1961) (citation omitted).

---

4. Mrs. Hemenway initially testified that she had been going her normal speed, which is about 40 miles per hour. On cross–examination, however, she admitted that she was not sure how fast she was going. While she was "pretty sure" she wasn't exceeding the speed limit, she admitted that she could have been going 50–55.

There is nothing in the language of the stipulation indicating an intent to relinquish future claims to costs. Rather, it appears to be designed merely to avoid having to seek a court order each time a party wished to depose an opponent's expert witness. We therefore believe that the stipulation should have no effect on a party's ability to recover as costs the expenses incurred in deposing expert witnesses.

REVERSED and REMANDED.